IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 17, 2006 Session

**GREG LANDAICHE and wife, COLLEEN LANDAICHE,
Plaintiffs/Appellees, v. JERRY JENKINS and wife, BELINDA JENKINS,
Defendants, and WAYNE BYRD, Defendant/Appellant, and BUDDY
MARTIN, JERRY JENKINS, BELINDA JENKINS and LEONARD F.
BROWN, Intervening Petitioners, and JACK ELKINS, MARILYN ELKINS,
JANIE V. LOVE, JOSEPH P. PAYNE, CHARLES PYLE, MARY
HOLLINGSWORTH BYRD, KYLE ROBINETTE, WANDA ROBINETTE,
and GARY WARDEN, Intervening Petitioners/Appellants, v. GREG
LANDAICHE and wife, COLLEEN LANDAICHE, Respondents/Appellees**

**Direct Appeal from the Chancery Court for Roane County
No.  14878     Hon. Frank V. Williams, III., Chancellor**

_____

**No. E2005-01357-COA-R3-CV  - FILED AUGUST 28, 2006**

_____

The Trial Court held that the easement at issue in this case had been abandoned.  On appeal, we affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Greg Leffew, Rockwood, Tennessee, for Appellants..

Robert Francis Chapski, Nashville, Tennessee, for Appellees.

# OPINION

In this action, Plaintiffs named as defendants, Jerry and Belinda Jenkins and Wayne Byrd, alleging that all the parties owned property in the Paint Rock Farm Lake Estates Subdivision, and that plaintiffs' lot bordered the Paint Rock Wildlife Management Area and Refuge. They averred they bought their property, in November 2002, which was heavily wooded and undeveloped. In 2003, they began clearing their property and installing a driveway to the site where they intended to build their home, and that people began trespassing on their property, and they asked for a restraining order and injunction, for relief. A temporary restraining order was issued to keep the defendants from contacting or harassing plaintiffs.

Defendants Answered and filed a Counter-Petition, asserting that a private easement existed which bisected plaintiffs' property, and led to a cleared field in the wildlife refuge, and that plaintiffs had illegally blocked the easement, and intentionally interfered with defendants' use of the easement. Defendants attached an Easement Deed, dated July 16, 1976, which states that the easements were granted to the Association and to "each and every member thereof". The Deed further states that Easement 5 extends all the way to the boundary of the wildlife refuge, and that if a roadway was constructed across easement 6, then easement 5 would cease to exist. Subsequently, the Association and several members filed a Motion to Intervene.

A hearing was held on April 1, 2004, on the pending motions/petition, and the Court ordered that plaintiffs' claims of outrageous conduct and intentional infliction of emotional distress would be stricken, and defendants and petitioners would be enjoined from coming on plaintiffs' property until the trial. The Court reserved all remaining issues for further hearing. The Association then voluntarily non-suited its Intervening Petition. The court then entered an Order which stated that the Association's claims would be dismissed without prejudice, but the claims of the individual members of the Association were at issue. Certain members also voluntarily non-suited their claims, after selling their property in the subdivision.

The trial of this matter was held on February 24 and 25, 2005, and numerous witnesses testified. At the conclusion of the evidentiary hearing, the Trial Judge took the matter under advisement and filed a written Opinion on August 5, 2005. We quote pertinent parts of that Opinion:

> The sole question presented to the Court is whether or not the Paint Rock Farm Lake Estates Owners Association and its members abandoned that portion of the described easement bisecting Lot 1 when construction was terminated in 1977 at the cul-de-sac. For the reasons which follow, the Court finds in favor of the Plaintiffs and against he Defendants and Intervenors on all issues.
>
> . . .

-2-

The original charter for the Owners Association and Restrictive Covenants were revised on February 26, 1977 which amended the provisions relative to roads in the subdivision as follows:

D)<u>Maintenance of Roads in Paint Rock Farm Lake Estates</u>. All road maintenance of roadways on property owned by Association members shall be the sole responsibility and expense of the Association, except that no road improvement assessment shall be made by the Association to those Association members whose tract(s) front only a previously existing county road. The 50 interior tracts are tracts numbers 1 through 21, 26, 32, 33, and 41 through 66.

3. <u>Setback Lines and Easements</u>. There shall be a 10-foot (5 ft. on either side) utility and drainage easement on all lot lines. Property lines, within the subdivision shall be measured to the center line of subdivision roadways with 50-foot easements to exist along said subdivision roadways, 25 feet on each side of the property lines. This provision shall not apply to those property lines fronting on a previously existing county road. No public roadway shall be built within the 10-foot utility easement except by mutual consent of the property owners sharing the common property line.

All roadway easements above described shall exist for the use and benefit of all Association members, their heirs, successors, and assigns.

The Road Committee of the Property Owners Association consisting of J.D. Elkins, Sim Porter, and R.R. Schmidt drafted a Road Plan. The goal was to eventually have the roads accepted by the County for maintenance, but that goal has not been achieved to date and they remain private, gravel roads.

After the Road Committee began its work in 1977 the initial effort was not to open Easement No. 5, but to construct Easement No. 6 which would have passed entirely to the rear of Lots 7 through 1. If Easement No. 6 had been constructed as described in Exhibit 6 it would have completely eliminated Easement No. 5.

. . .

But the Road Committee almost immediately ran into problems with the construction of Easement No. 6, and abandoned all efforts at opening that way. At that point the dozer operator, as described by one witness, took the "path of least resistance," and constructed Easement No. 5 as it exists today, terminating the road at a cul-de-sac at the boundary of Lot 1. The road was graveled and used by motor vehicles, when passable, up to the cul-de-sac. This had the effect of leaving the remnant of the first road blazed by the developer across Lot 1 prior to the auction in 1976. As the years went by, the Property Owners Association, through its Road Committee, made additional improvements to Easement No. 5, always terminating

at the cul-de-sac at the boundary of Lot No. 1. The result was that the section of the original road blazed by the developer through Lot No. 1 to the boundary of the wildlife refuge "went back to nature." Small trees and undergrowth essentially took over the original dirt road through Lot 1 except for a small trail or path through the woods that, in places, would have been wide enough to accommodate a four-wheeler or two horses walking side-by-side. For more than twenty years following 1977 the original road through Lot No. 1 remained essentially unused by anyone except the owner, occasional hunters, and other trespassers.[1]

As additional improvements were made to Easement No. 5, particularly after the formation and work of the 1995 Road Committee, additional people began walking down the gravel road, through the cul-de-sac, and across the trail on Lot No. 1 to get to the wildlife refuge. In the late 1990s after houses began being constructed in the area some people drove four-wheelers, road [sic] horses, and walked to the field to which the Defendants and Intervenors now want access. Restrictions imposed by the Tennessee Wildlife Resources Agency prohibit the operation of motor vehicles or horseback riding at any time in the refuse. And all access to the refuge, even by those on foot, is absolutely prohibited by the TWRA from October until February of every year. Consequently, the trail across Lot 1 to the Paint Rock Wildlife Refuge would be available to people only during the spring and summer months and only then to carry people to the refuse boundary where they could then walk to the filed overlooking Watts Bar Lake.

Except for the months immediately prior to the filing of this lawsuit, the trail across Lot No. 1 does not appear to have been used by anyone asserting a contractual right to the easement across Lot No. 1, but would be more accurately described as random acts of trespass, some of which were not confined to the trail but included other parts of Lot No. 1. . . . There is no indication that any intermittent use of the easement through Lot 1 until shortly before the filing of this lawsuit was of such nature as to give the owner of Lot 1 notice that people were using the easement pursuant to any claim that they had a right to do so.

. . .

There is clear and convincing proof that the easement described in Exhibit 6 as it passes through Lot 1 has been abandoned. The Road Committee, carrying out the plan approved by the Property Owners Association in 1977, stopped building the road at Lot 1 because they were running out of money, and because of an agreement reached by the man who then owned Lot 1, Paul Goranson. Once the road, now called Eagle Ridge Road, was completed to the cul-de-sec at Mr. Goranson's line, the

---

[1]Mere non-use will not amount to an abandonment, but "time" may be taken into account as indicative of intent to abandon. *Jacoway v. Dalmen*, 753 S.W. 675, 679 (Tenn. App. 1987).

objective of providing everybody with ingress and egress to their property had been met. In fact, Mr. Goranson testified that it was Mr. Jack Elkins, one of the intervenors and developer of the 1977 Road Plan, who suggested that the Road Committee not build the road through Lot 1 because it served no purpose. There was unanimous agreement to that plan and the work which began in 1977 and which has been improved upon as late as 1995 has held, without deviation, to the road as originally constructed to the cul-de-sac. There was no maintenance of the road past that point. Don Coward, who was President of the Property Owners Association from 1995 to 1997 and was instrumental in preparing the 1995 Road Plan, testified that Mr. Elkins told him that the road ended at Lot 1, and that was as far as they need to go with improvements. Access to the water was off of Lot 10.

There was disputed testimony as to when and who traversed the easement. The Trial Court obviously credited the testimony of Paul Goranson. He testified that he purchased Lot 1 in 1976 and sold it to the plaintiffs in 1995. Goranson testified that in 1976 the roads were single lane and had been "painted" with gravel, but were impassible when wet. He was on the first Board of Directors of the Association, and met with the road committee regarding the work to be done on the roads. He testified that Jack Elkins suggested not building a road across Lot 1, because it served no purpose, and Goranson requested that they not continue the road across Lot 1, but instead end it at the cul-de-sac at the boundary of the lot. He testified the road committee agreed, and the road was completed in December 1977, as per the agreement.

He testified that he planned to build a home there and he cut a driveway and put a gate across it, and that he gave various people permission to cross his property through the years, and he basically gave Jack Elkins "the run" of his property and gave him a key to the gate, so he could help him keep watch over it and keep hunters out. He further testified that the road that was cut across his lot the approximate area of the wildlife refuge was never maintained by the Association and it began to "go back to nature" and grow over. He testified there was evidence of people riding ATVs on the easement across his lot, but he characterized them as trespassers, and that Jack Elkins and Leonard Brown had permission to cross his property, and he got other calls from lot owners who wanted to cross his property to get to the wildlife refuge, and he gave them permission as well.

Goranson testified that when the sold the property to the plaintiffs, he told them the easement had been abandoned, and that the period when he saw evidence of trespassing was in the late seventies and early eighties.

The sole issue on appeal is whether the Trial Court erred in holding that a portion of the deeded easement had been abandoned?

This Court must review the Trial Court's factual findings *de novo* with a presumption of correctness, unless the evidence preponderates against the findings, but no such presumption is given to the Trial Court's conclusions of law. Tenn. R. App. P. 13(d).

An easement is an interest in property "that confers on its holder a legally enforceable right to use another's property for a specific purpose." *Hall v. Pippin*, 984 S.W.2d 617 (Tenn. Ct. App. 1998). If an easement is claimed under a grant, the extent of the easement is determined by the language of the deed or granting instrument. *Foshee v. Brigman*, 129 S.W.2d 207 (Tenn. 1939). "The overriding purpose of any deed interpretation is the determination of the grantors' intent of the conveyance." *Collins v. Smithson*, 585 S.W.2d 598 (Tenn.1979). .

A party alleging that a deeded easement has been abandoned must show an intent to abandon by clear and convincing evidence. *Hall; see also Miller v. Street*, 663 S.W.2d 797 (Tenn. Ct. App. 1983). This Court in *Hall*, said at 620-621:

> Non-use [of the easement] must be "coupled with proof that the easement holder or holders intended to abandon the easement", (citations omitted). This intention may be proved with evidence of acts "clearly indicating that the easement holder desires to lay no further claim to the benefits of the easement." Citations omitted)

> Abandonment may be proved by either a single act or a series of acts. *See Smelcer v. Rippentoe*, 24 Tenn. App. 516, 522, 147 S.W.2d 109-113 (1940).

Proof of non-use must be "coupled with proof that the easement holder or holders intended to abandon the easement". *Hall*; *Hill v. U.S. Life Title Ins. Co.*, 731 S.W.2d 910 (Tenn. Ct. App. 1986). While some witnesses testified to occasional use of the easement without permission of the owner of the lot, the Trial Court's findings of fact rejects this testimony. Any conflicting testimony requiring determination of the credibility of witnesses is for the trial court, and its findings are binding on the appellate court, unless from other real evidence we are compelled to conclude otherwise. *Hudson v. Capps* 651 S.W.2d 243 (Tenn. Ct. App. 1983). Accordingly, the Chancellor is the judge of the credibility of the witnesses, and the evidence supports the Trial Court's finding that the easement was abandoned beyond the cul-de-sac.

The Judgment of the Trial Court is affirmed and the cause remanded, with the cost of the appeal assessed jointly to the defendants and intervening petitioners.

---

HERSCHEL PICKENS FRANKS, P.J.